IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DANIEL GARRETT LEWIS | CRIMINAL ACTION FILE NO.<br><br>1:18-CR-187-ELR-JKL |

## **FINAL REPORT AND RECOMMENDATION**

This case is before the Court on Defendant Daniel Garrett Lewis's Motion to Suppress Statements Made to Law Enforcement, in which he moves to suppress statements he made during a custodial interrogation with federal law enforcement agents at the Calhoun County Jail in Alabama. [Doc. 25 ("Motion to Suppress"); *see also* Docs. 59 and 61 (post-hearing brief and reply).] He contends that at the time of the interrogation he was suffering from a mental impairment and that, as a result, his *Miranda* waiver was not voluntary, knowing, or intelligent. [*Id.*] For the reasons the follow, it is **RECOMMENDED** that Lewis's Motion to Suppress be **GRANTED**.

I.   **BACKGROUND**

A.   **Procedural Background**

In this case, Lewis is charged in a nine-count indictment with writing and mailing threatening letters in 2018 to various government officials, including the President, the then-present Attorney General, a judge from this District, and a probation officer, in violation of 18 U.S.C. §§ 115, 871, 876, 884, and 1114. [Doc. 1.]  Lewis was interviewed by federal law enforcement officers in relation to the present charges while in state custody in Alabama on April 20, 2018.  After his arraignment and continuances, Lewis filed a preliminary motion to suppress statements from that April 2018 interview on October 18, 2019.  [Doc. 25.] Following related motions and pretrial conferences, the undersigned held an evidentiary hearing on December 5, 2019, at which FBI Special Agent Marcus Brackman (one of the agents who conducted April 2018 interview) and psychiatrist Tracey Marks, M.D. testified.  [*See* Docs. 49, 58.]  After the hearing, on January 9, 2020, Lewis submitted a perfected post-hearing brief in support of the Motion to Suppress.  [Doc. 59.]

The government's response was due on January 30, 2020 [*see* Doc. 49 (setting forth post-hearing briefing schedule)]; however, the government did not file a response or move for a continuance.  Notably, when government counsel was

thereafter contacted by chambers to determine whether the government planned to oppose the motion, counsel responded that he had been busy with trial, but failed to clarify whether the motion would be opposed, request a continuance, or indeed, take any substantive action whatsoever.  On February 6, 2020, Lewis filed a timely reply, reiterating his earlier arguments and urging the Court to deem his motion unopposed in light of the government's failure to file a response.  [Doc. 61.]

### B.     Factual Background

On April 20, 2018, SA Brackman and Senior Inspector Charles Ahmad of the United States Marshal Service (together, the "Agents") interviewed Lewis at the Calhoun County Jail in Alabama in order to obtain confirmation that he had written threatening letters to government officials and to conduct a threat assessment.  [Doc. 58 (hearing transcript, hereinafter "Hr'g Tr.") at 8-10, 20.] Before the interview began, no one at the jail expressed concern to SA Brackman about Lewis's mental health.  (*Id*. at 25.)  The interview began around 12:15 pm, and SA Brackman and SI Ahmad met with Lewis in a room in the jail that was approximately ten by ten feet and had a table and chairs.  (*Id*. at 24-25.)  The door

was locked, and based upon the audio recording, Lewis appears to have been shackled throughout. (*Id.* at 25.) [*See also* Doc. 53 (Gov't Ex. 1 at 1-2.[1]).]

At the outset of the interview, the Agents[2] advised Lewis of his *Miranda* rights and asked him to review and acknowledge a *Miranda* advice-of-rights waiver form. (Gov't Ex. 1 at 1-2.) [*See also* Doc. 51-1 (executed advice-of-rights form).] Lewis complied, signing the advice-of-rights form and, on his own volition, he initialed each line of the form. (Hr'g Tr. at 11.) The Agents then immediately asked if and why Lewis sent the threatening letters. (Gov't Ex. 1 at 2.) Lewis's response was confused, stuttering, and hard to follow, though he appeared to acknowledge mailing them. (*Id.* at 2-4.) Lewis ascribed conspiratorial motives to government authorities, saying he was angry and upset at the government ever since he had been removed from his mother's custody as a child, was "beat up," and was moved around all of his life. (*Id.* at 4-6.) He said that he had been successful in his life following earlier charges, but that authorities lied to him and

---

[1] The audio recording of the April 20, 2018 interview was admitted into evidence as Government Exhibit 1 at the evidentiary hearing. (*See* Hr'g Tr. at 16.) References to the audio recording are to the relevant minute of the record.

[2] In the recording of the interview, the Agents do not identify themselves. Because the Court is unable to determine which agent is speaking at any given point, it will refer to them jointly.

4

hid court proceedings from him in order undermine his case, as well as "push his buttons." (*Id.* at 6-8.) Lewis's monologuing was halting and disjointed.

After six to seven minutes of largely uninterrupted rambling, Lewis mentioned that he only had one friend, Tanya, that she did not understand him, and that he had previously tried to have himself killed by the police. (Gov't Ex. 1 at 8-9.) After a brief discussion of his potential prison sentence and the circumstances of his earlier charges for possession of forged instruments (*id.* at 9-12), the Agents asked again about the letters (*id.* at 12). Lewis said he remembered sending the letters to Atlanta, but was worried that if he talked to the Agents about them, they would "get mad and start yelling." (*Id.* at 13.) After the Agents said they would not, Lewis said he sent the letters because he wanted to "fight with them" and give "them" a chance to fight him (that is, Lewis), and so he could work out his anger and get back to his family. (*Id.* at 13-14.) Lewis then began another disjointed colloquy, discussing a business he had started after his arrest, noting how he alienated he had been by being stuck in Atlanta (presumably because his travel was restricted as a condition of release), complaining that he could not see his family, and returning to the idea that he could fight "them" and they might kill him just to "deal with it." (*Id.* at 14-17.)

5

Asked again about the letters, Lewis disjointedly returned to having been abused, sexually assaulted, and given medication as a child; to not having friends; to not having "made [him]self this way"; to being abandoned by family in Iowa; and to wanting to be killed by police in relation to a "bomb charge." (Gov't Ex. 1 at 17-20.) Asked about hurting government officials, Lewis said he would allow them to fight him in a gun fight if they wanted. (*Id.* at 19-20.) He said he would shoot a gun if he had one, but that it "wouldn't be me shooting it." (*Id.* at 20.)

The Agents then asked if Lewis knew that the letters were threatening and that it was illegal to threaten public officials, to which Lewis answered affirmatively. (Gov't Ex. 1 at 20-21.) Asked if he had access to guns or bombs, Lewis said he knew someone who hung out in Piedmont Park who had access to a gun, and that he had learned how to make pipe bombs before his incarceration.[3] (*Id.* at 21-24.) The Agents asked Lewis about confronting the letters' recipients following his imprisonment, and Lewis said he would, either in a fist fight or with a gun or bomb "if [he] could," but that ultimately, he would "make them kill me," because "that's the only way it's ever going to end, my hatred—only every, every,

---

[3] Lewis later clarified that he had "information on his phone" about how to make a bomb. (Gov't Ex. 1 at 46.)

every year, I turn another age, it gets worse and worse. I can't never do what they want me to do, cause some odd reason I'm just stupid." (*Id.* at 24-26.) Lewis's statements continued to be hesitant, stumbling, and disorganized.

The Agents then asked Lewis about the particular recipients of the letters, why Lewis threatened them, what Lewis would do if he saw them after his release, and whether he wanted to see harm come to them; Lewis indicated that he wished harm would come to them. (Gov't Ex. 1 at 26-28.) The Agents inquired about the means Lewis would use, and Lewis indicated he would get drunk and use a gun to shoot up the courthouse. (*Id.* at 28-29.) In response to questioning, Lewis acknowledged that such actions would be retaliation for "everything" that had happened to him, starting from his childhood; he then recounted, unprompted, being "cut" 22 times in his mouth by his father when he was 14 years old. (*Id.* at 30-32.) Mr. Lewis responded "yeah," when asked directly if the federal government was his enemy. (*Id.* at 33-34.) After an aside about his acquaintances, the Agents returned to other subjects of Lewis's ire, including another judge, the probation office, and the United States Attorney's office—the last an enemy because they wanted to hurt him. (Gov't Ex. 1 at 35-38.)

Then, in a halting statement, Lewis said he was not a common criminal, did not wake up wanting to hurt people, but "just [had] this anger that was instilled in me. I don't. I need, I need, I need help." (Gov't Ex. 1 at 38.) In response to Lewis saying he needed help, one of the Agents finally asked, "Speaking of that, do you know what medications you're taking right now?" (*Id*. at 39.) Lewis then rattled off an unsure list of three medications—Haldol, Cogetin, and Keppra—for the Agents, and complained that the medications do not help him. (*Id*. at 40; *see also* Hr'g Tr. at 30.) Lewis said that the prison officials did not have his medical records and did not carry the medications that would help him. (Gov't Ex. 1 at 40.) Lewis said he had asked for a counselor, but that "they don't answer nothing." (*Id*. 41.)

After a short discussion about his conditions, being hurt by other inmates, and his religious practices (Gov't Ex. 1 at 41-43), Lewis returned to his mental health, saying he did not want to be in state prison, because when he was in federal custody he had a counselor he could talk to and was able to take the "right meds," which the jail was not providing (*id.* at 44). Asked which he would prefer between freedom "outside" the prison system or being in federal custody, Lewis said simply "federal penitentiary." (*Id*. at 45.) Pressed, he confirmed his response, and indicated that if he were released, he did not believe he would be able to control his

8

anger. (*Id.*) He thereafter reiterated that he "misse[d]" federal custody because he received mental health services there and because he was not getting his "proper medicine" at the Calhoun County Jail. (*Id.* at 45-46; *see also* Hr'g Tr. at 30.) After a brief discussion about whether Lewis would be charged in connection with the letters, the Agents concluded the interview around 1:00 pm.

### C. Expert Testimony

As noted above, Dr. Tracy Marks was also called to testify at the hearing. (Hr'g Tr. at 32.) Dr. Marks received her medical degree in 1996 from the University of Florida and did post-doctoral work at Cornell and Columbia. [*See* Doc. 52-1 (Def. Ex. 1 (Dr. Marks's curriculum vitae)).] Dr. Marks has since worked for more than 18 years in private practice and has provided expert opinions in various settings, including criminal cases and civil litigation, and testified as an expert upwards of 40 times, including offering expert testimony as to criminal defendants' competency. (Hr'g Tr. at 34-36.) At the hearing, Dr. Marks was accepted without objection by the government as an expert in the field of forensic psychiatry. (*Id.*)

In providing mental evaluations in these contexts, Dr. Marks typically reviews an individual's health records, including prior psychiatric or medical history, any written reports, and/or medical documentation; looks at discovery

9

materials related to case, including the crime a person is accused of, any statements made to law enforcement, and any observations about the person's behavior; and then reviews any evaluations of the individual that were conducted following the alleged criminal conduct. (Hr'g Tr. at 37-38.)

Dr. Marks first evaluated Lewis in 2012, apparently in connection with other threatening letters, and prepared a report at that time. (Hr'g Tr. at 37, 40.) In that instance, she reviewed discovery materials, a previous competency evaluation by Dr. Todd Antin from 2006, a number of medical records dating back to childhood, records from the Illinois Department of Children and Family Services, jail/prison records, and medical treatment records from San Marcos Treatment Center, Georgia Regional Hospital, Grady Hospital, the Georgia Department of Corrections, Northeast Georgia Health System, and Singer Mental Health Center. (*Id.* at 39.) She also interviewed Lewis at that time. (*Id.* at 40.) Though she did not review all of the preceding records before her most recent evaluation of Lewis, she did review her 2012 report and had a sufficient recall of his mental health history. (*Id.* at 40.) In addition to the foregoing, in preparing for her 2018 examination of Lewis, Dr. Marks also reviewed the indictment in this case, discovery materials, and records from the Calhoun County Sherriff's Office and

the Calhoun County Jail. (*Id*. at 40-41.) Dr. Marks then met with Lewis on September 27 and October 25, 2018, at the Robert A. Deyton Detention Facility. (*Id.* at 41.) During her visit, Dr. Marks interviewed Lewis[4] to assess Lewis's mental competency around the time of his interview with the Agents[5] and to evaluate possible feigning or malingering. (*Id.* at 42-44.) Following her visit, she also listened to an audio recording of the April 20, 2018 interview and reviewed the *Miranda* waiver-of-rights form. (*Id.* at 50-52.)

Based upon the foregoing, Dr. Marks prepared a report memorializing her assessment of Lewis's mental capacity around the time of his interview with the Agents. (*See* Def. Ex. 2 [Doc. 52-2].) Dr. Marks concluded that Lewis has suffered from schizophrenia, paranoid type for "many years," and that he also has borderline personality disorder and seizure disorder, which could have psychiatric and/or psychotic manifestations impacting judgment and impulsivity. (Hr'g Tr. at 44-45;

---

[4] At that time, it appears Lewis was on the appropriate regimen of medications. (Hr'g Tr. at 77-78.)

[5] When Dr. Marks interviewed Lewis, her primary purpose was to evaluate his competency as it related to his offenses (his "criminal responsibility," as she phrased it); even so, the last letter was sent only a month prior to the April 2018 interview. (Hr'g Tr. 51, 73-74; *see also* Def. Ex. 2 at 2.) Her hearing testimony, meanwhile, was specifically offered to provide her expert opinion as to the waiver of Lewis's *Miranda* rights at the April 2018 interview.

*see also* Def. Ex. 2 at 2.) These conditions in combination make treatment and medication difficult, because the medications for treating psychosis lower seizure thresholds. (*Id.*) During Lewis's initial incarceration at the Calhoun County Jail between December 2017 and February 2018, he was not given any medications; and Dr. Marks further concluded that even beyond that time, Lewis was not taking a prescribed anti-psychotic medication, Haldol.[6] (*Id.* at 46-48.) Lewis's records also showed him suffering from seizure activity in the Calhoun County Jail in February 2018. (*Id.* at 48-49.)

In her review of his records and the interview audio, as well as during her examination and interview of Lewis, Dr. Marks found many of Lewis's answers nonsensical, reflecting paranoid and/or delusional thinking. (Hr'g Tr. at 55-56.) Given the longitudinal nature of his problems and symptoms, and that fact that they presented irrespective of any possible consequences (positive or negative), she did not have any concerns that Lewis was feigning or exaggerating his condition. (*Id.* at 56-57.) Dr. Marks concluded that at the time of the April 20, 2018 interview, he was "still psychotic and primarily delusional," and that his "state of mind impaired

---

[6] Based upon Lewis's reports to her, his prior allergic reaction to it, and jail records, including Lewis' contemporaneous reports at the jail. (Hr'g Tr. at 47-48, 79-81.)

his ability to knowingly and voluntarily waive his rights." (*Id.* at 52; *see also* Def. Ex. 2.)  She further explained that while he might have had the intellectual capacity to literally understand the waiver-of-rights form, he could not appreciate or understand the great significance executing it. (Hr'g Tr. at 53.)  Being "still very paranoid" at the time, Dr. Marks testified that Lewis "was not able to freely and knowing give up [] or waive his Miranda rights." (*Id.* at 54-55.)

Additional facts are discussed as necessary in the analysis below.

## II.   DISCUSSION

### A.   Lewis's Arguments

As noted in the introduction, the issue raised by Lewis's Motion to Suppress is whether his waiver of his *Miranda* rights during his April 20, 2018 interview with the Agents was valid. [*See* Doc. 59.]  Lewis argues primarily that due to the nature of his mental impairments, exacerbated by improper medication (or the lack of medication), he did not have an adequate awareness of the nature of his *Miranda* rights and the consequences of waiving them; and as a result, his waiver was not knowing or intelligently made, and his subsequent statements should be suppressed.

[*Id.* at 10-17.][7]  As discussed, the government has provided no argument in opposition.

---

[7] Lewis also argues that because the Agents that "took advantage of [] Lewis'[s] mental health weaknesses," his waiver was not voluntary.  [Doc. 59 at 12-14.]  Because the government has not met its burden to show that Lewis's waiver was knowing and intelligent, the Court need not address the closer issue of voluntariness, which was not well explained in Lewis's briefs or addressed by Dr. Marks's testimony.

The Court notes briefly, however, that the Eleventh Circuit recognizes that a diminished mental capacity does not alone render a waiver or subsequent statements involuntary.  *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995) ("The fact that a defendant suffers a mental disability does not, by itself, render a waiver involuntary.").  Rather, for a waiver to be involuntary, there must be psychological or physical coercion by an official actor (such as a law enforcement agent) who takes advantage of the defendant's mental impairment.  *Barbour*, 70 F.3d at 585; *see also Colorado v. Connelly*, 479 U.S. 157, 167 (1986) (holding that coercive police activity is a necessary predicate for finding that a confession is not voluntary).  The only conduct Lewis identifies as "coercive" is the Agents' failure to research Lewis's mental health history before interviewing him, and their failure to conclude that Lewis was delusion during the interview and terminate it.  [Doc. 12 at 12-14.]  However, neither of these directly implicates the Agents' conduct as it pertains to the waiver itself.  Further, even after the waiver, there were no threats directed at Lewis, Lewis was not pressured to answer any of the Agents' questions, most of Lewis's statements were made extemporaneously, and Lewis did not appear to be in any pain or discomfort.  *See Moran v. Burbine*, 475 U.S. 412, 421 (1986) ("[T]he relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception . . . .  [T]he record is devoid of any suggestion that police resorted to physical or psychological pressure to elicit the statements"); *see also Miller v. Dugger*, 838 F.2d 1530, 1537 (11th Cir. 1988) ("[E]ven the interrogators' knowledge that a suspect may have mental problems does not make the suspect's statement involuntary unless the police exploited this weakness *with coercive tactics*.") (quotation and marks removed).

### B.   Applicable Law

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.  In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court created a presumption that statements elicited during a custodial interrogation of a suspect are unconstitutionally coerced unless the suspect is first advised of his right to remain silent and to have an attorney present during any questioning. *United States v. Patane*, 542 U.S. 630, 639 (2004); *Miranda*, 384 U.S. at 444-45.  As a result, questioning may proceed only if the suspect lawfully waives his rights.  Without a valid waiver, "evidence obtained as a result of a custodial interrogation is inadmissible . . . ." *United States v. Parr*, 716 F.2d 796, 817 (11th Cir. 1983).

The inquiry as to whether a suspect has validly waived his rights has "[t]wo distinct dimensions":

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must

---

Finally, the Court notes that the "voluntariness of statements is analyzed similarly to voluntariness of the *Miranda* waiver." *United States v. Byrd*, No. 1:16-CR-315-TWT-AJB, 2017 WL 3821696, at *5 (N.D. Ga. Aug. 7, 2017), *report and recommendation adopted*, No. 1:16-CR-315-2-TWT, 2017 WL 3783029 (N.D. Ga. Aug. 31, 2017).  Significantly, Lewis does not argue that his statements themselves were not voluntary, instead arguing only about the validity of his *Miranda* waiver.

> have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran*, 475 U.S. at 421 (quotation and citation omitted). "With regard to the second prong of *Miranda*, the test of whether a person is too affected [by mental problems] to knowingly, intelligently, and voluntarily waive his *Miranda* rights is one of coherence and an understanding of what is happening." *United States v. Harris*, No. 4:11-CR-18-HLM-WEJ, 2011 WL 5514003, at *7 (N.D. Ga. Oct. 21, 2011), *report and recommendation adopted*, 2011 WL 5514058 (N.D. Ga. Nov. 10, 2011). Whether there has been a knowing and intelligent waiver will depend on the particular facts and circumstances in the given case, including the background, experience, and conduct of the accused. *See Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (citing *Johnson v. Zerbst*, 304 U.S. 458 (1938)). Importantly for present purposes, there is a presumption against waiver, and the government therefore bears the burden of proving by a preponderance of the evidence that the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. *United States v. Bernal-Benitez*, 594 F.3d 1303, 1318 (11th Cir. 2010); *see also*

*Connelly*, 479 U.S. at 168 ("[T]he State need prove waiver [] by a preponderance of the evidence.").

### C. Analysis

"There is little doubt that mental illness can interfere with a defendant's ability to make a knowing and intelligent waiver of his *Miranda* rights." *Miller*, 838 F.2d at 1539. Although there is some evidence that Lewis's waiver was knowing and intelligent—for example, he spoke English, was able to read, and had a GED; he reviewed, initialed, and signed the waiver form[8]; and Dr. Marks testified that he probably had the intellectual capacity to literally understand the waiver form—the Court is not persuaded that the government has carried its burden to show by a ponderance of the evidence that the waiver was in fact so. The government has offered no contrary psychiatric or psychological evidence reflecting on the import of Lewis's mental health impairments, the significance of his medication or lack thereof, or the extent to which any diminished mental capacity impacted his appreciation of the waiver form or the consequences of

---

[8] An express oral or written waiver of *Miranda* is strong proof of the validity of the waiver. *United States v. Stephens*, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002). However, it neither necessary nor sufficient to establish waiver. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979).

waiving his *Miranda* rights. At the hearing, government counsel appeared to urge simply that Lewis's many criminal entanglements made it likely that he understood his rights and the significance of talking to law enforcement.

To the contrary, strong evidence—in the form of Dr. Marks's testimony, her report, and the audio recording of the interview—appears to demonstrate that more likely than not, Lewis had not been taking the proper medications, was suffering from delusional and paranoid thinking, and as a consequence, did not appreciate the full consequences of waiving his *Miranda* rights. Indeed, while Dr. Marks granted that Lewis might have literally understood the waiver form, she also testified that due to his mental impairments, he still could not appreciate the nature of the rights he abandoned or the significance of abandoning them. Lewis's medical history and the audio recording of the interview further bear out that Lewis was not properly medicated; that his thinking was confused and disjointed; that he was suffering from persecutory delusions, paranoia, and suicidal ideation; and that he was not receiving adequate mental health services. Indeed, in no uncertain terms, Lewis stated his preference for incarceration in federal custody over freedom (as well as his then-present incarceration at the Calhoun County Jail), because he

believed he might get some small amount of mental health treatment and relief there—which he was not then receiving.

Ultimately, according to the unrebutted testimony of Dr. Marks, the audio recording substantiating it, and the unanswered arguments in Lewis's motion, the Court is constrained to conclude that the government has not shown that Lewis had the capacity to understand the import of his waiver—and thus, it has not shown that he was capable of making a knowing and intelligent waiver in this instance. Without more from the government, the undersigned cannot infer Lewis's awareness of both the nature of his rights being abandoned and the consequences of abandoning them merely from Lewis's literacy, his familiarity with the criminal justice process, and his execution of the waiver form.

In sum, after considering the totality of the circumstances and keeping in mind that the government bears the burden of demonstrating a knowing and intelligent waiver by a preponderance of the evidence, the Court concludes that the government has failed to meet its burden in this case to show that more likely than not Lewis's *Miranda* waiver on April 20, 2018 was knowing and intelligent. Consequently, his subsequent statements to SA Brackman and SI Ahmad should be suppressed.

### III.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Lewis' motion to suppress be **GRANTED**.  [Doc. 25.]

I have now addressed all referred pretrial matters relating to this defendant and have not been advised of any impediments to the scheduling of a trial. Accordingly, this case is **CERTIFIED READY FOR TRIAL.**

IT IS SO RECOMMENDED this 14th day of February, 2020.

_____
JOHN K. LARKINS III
United States Magistrate Judge